GAUDIN, Judge.
This is an appeal by Joseph J. Matranga Jr. from a judgment of the 24th Judicial District Court which rescinded a sale of stock by appellant to Steel, Inc. and which voided the related promissory note signed on September 18, 1981 by a corporate executive and by appellee Jack C. Watson personally.
The trial judge found (1) that Matranga was not a holder in due course and (2) that there was no consideration for the note. We affirm.
Watson instituted the district court litigation, alleging that the stock sold by Ma-tranga was worthless. Matranga had owned five per cent of Steel, Inc. In response to the lawsuit, Matranga denied that any recision was due; and, as a plaintiff in reconvention, made demand on Watson for the value of the promissory note plus interest and attorney fees.
The trial court’s assigned “Reasons for Judgment” stated, in pertinent part:
“It is the opinion of this Court that Ma-tranga does not meet the requirements for Holder of Due Course status, therefore failure of consideration is a valid defense. Michael O’Rourke, a CPA appointed by the Bankruptcy Court, testified at trial that the financial reports of Steel, Inc. from March 1, 1981, through December 31, 1981, did not present a true and correct reflection of the actual financial condition of the corporation. His testimony further revealed that Steel, Inc. sustained a $3,775,000.00 operating loss from March 1, 1981, through March 15, 1982. This information was not reflected in the in house financial reports given to Watson. Also the company’s books which showed a $123,000.00 profit from March 1, 1981, to December 31,1981, were inaccurate. As a result of the foregoing, Mr. O’Rourke testified that Steel, Inc. was probably insolvent as of the time of the act of sale on September 18, 1981. It is the finding of this Court that based on the above foregoing there was a failure of consideration given in exchange for the execution of the note.”
Although he is the note’s payee, Matran-ga argues that he is a true holder in due course because he was in good faith regarding the sale and had no knowledge or notice of any defect in either the business or the promissory note. Accordingly, Watson should have been precluded from employing a lack of consideration defense.
In district court pleadings and during the bench trial, Matranga did not contend that he was a holder in due course and that, therefore, a lack of consideration defense could not avail Watson. It was only after trial that Matranga made these assertions. Nonetheless, the trial judge’s finding that Matranga was not a holder in due course was not manifestly erroneous. Matranga was an immediate party to the transaction, dealing directly with Watson, selling shares *713 of stock in a company he was familiar with since its inception.
Matranga sold his stock for $57,314.40 on September 18, 1981 after advising Watson by letter dated July 16, 1981 that he (Ma-tranga) believed his 3,300 shares were worth $150,000.00. Matranga ultimately received $25,000.00 in cash and a promissory note for the $32,314.40 balance. He would not accept a note signed only by a representative of Steel, Inc.; he demanded that Watson, personally, also sign the note. Matranga left Steel, Inc. in January, 1982, saying that his services were neither appreciated nor monitarily rewarded. He said that he wasn’t aware of the company’s financial troubles until February, 1982.
Prior to the enactment of Title 10 of the Louisiana Revised Statutes in 1975, a payee could not be a holder in due course. Now, a payee may be a holder in due course. See LSA-R.S. 10:3-302(2), also Courtesy Financial Services v. Hughes, 424 So.2d 1172 (La.App. 1 Cir.1982), wherein the court said Id, at 1175:
“Although a payee may be a holder in due course, said status is not automatic. When the payee deals with the maker through an intermediary (remitter) and does not have notices of defenses, such an isolated payee may take as a holder in due course. In most instances, however, a payee will not be a holder in due course because said payee will usually have notices of defenses and claims by virtue of the fact that he has dealt directly with the maker.”
Steel, Inc. was formed in 1976 by Watson’s father-in-law, Zac Carter, and four former employees of Avondale Shipyards, including Matranga, who was made a member of the Board of Directors. At the time of the sale of his stock, Matranga was a vice-president and actively involved in outside sales.
We are unaware of any Louisiana case, and none has been cited by appellant, holding that a payee on a promissory note who had constant, direct and meaningful contact with the maker can somehow assume holder in due course status, particularly if the payee had sold an interest in a company he helped found, worked for and partially owned. Such a payee cannot be a holder in due course.
Watson was a board member of Steel, Inc. but he was not involved in the day-to-day conduct of company business. He said that almost all of his information about corporate affairs came from the firm’s president, James Rabalais. Watson did not learn of the company’s apparent insolvency until February, 1982 following an audit by Kenneth Reeves, a certified public accountant. In March, 1982, Steel, Inc. filed for bankruptcy. Rabalais did not testify at trial.
Reeves, who described himself as the company’s outside auditor, said that audits were conducted at the end of each fiscal year, which was on February 28th. In 1982, however, Reeves began his audit earlier than usual because a potential money lender asked for an accurate verification of the company’s inventory. By that time, Lynn LeBlanc had replaced Rabalais as president of Steel, Inc. Inventory procedures were started on February 5, 1982. The inventory soon revealed a $2,000,-000.00 plus inventory shortage. Reeves said:
"... based on my procedures that I had done at that point ... the company was insolvent and, in fact, was bankrupt.”
Watson, Reeves said, was “in shock” when advised of the audit. Monthly financial statements when Rabalais was president showed the company in strong financial position. However, Reeves explained, improper accounting procedures, grossly inflated earnings and accounts receivable and prebilling, along with capitalization of interest, contributed to the misleading financial statements. Reeves blamed Raba-lais and the company comptroller who worked under Rabalais’ supervision for the inaccuracies. Reeves added that while the financial statements were blatantly deceiving, there was nothing in them that would have triggered suspicion. “But,” Reeves said, “those documents were very misleading because they contained inflated figures.”
*714 After Steel, Inc. filed for bankruptcy, the United States Bankruptcy Court appointed Michael O’Rourke, a certified public accountant, to attempt to find the reasons for the corporation’s financial failure. O'Rourke’s investigation covered the period from March 1, 1981 to March 15, 1982. O’Rourke said that the financial records under Rabalais “grossly overstated” the amount of inventory actually in existence by approximately $3,000,000.00. Steel, Inc., according to O’Rourke, was able to borrow money by fictitiously increasing accounts receivable and by using other accounting methods which seriously distorted the company’s true financial structure.
O’Rourke, saying that Rabalais was “primarily responsible” for the company’s financial condition, concluded that Steel, Inc. was insolvent in September, 1981.
In the district court, Matranga did not try to show that Steel, Inc. was solvent in September, 1981. The testimony of Reeves and O’Rourke went unchallenged. Instead, Matranga contends that the testimony of the certified public accountants was inadmissible and that, in any event, Watson was in a better position than he (Matranga) was to ascertain the real value of company stock before and at the time of the sale in September, 1981.
The testimony of Reeves and O’Rourke was clearly admissible to show lack of consideration for the stock sale and to establish the major role Rabalais played in the company’s demise. Both certified public accountants said that none of the financial reports or records prepared under Raba-lais’ supervision gave any indication that Steel, Inc. was failing. There was no apparent reason for Watson or any other executive of Steel, Inc. to become distrustful or order an immediate audit. It was only when the annual audit was begun in February, 1981 did the exact picture emerge.
In the overall analysis of this matter, the trial judge made two case-deciding findings of fact. First, he found that Matranga was not a holder in due course; secondly, the trial judge found a lack of consideration. There is substantial and much unrebutted testimony and evidence supportive of both findings.
Matranga is to bear costs of this appeal.
AFFIRMED.